# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MONSTER ENERGY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15 C 4166 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| CHEN WENSHENG, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On May 12, 2015, Monster Energy Company (MEC) filed suit against Chinese entities that have offered counterfeit Monster Energy products for sale online ("defendants")[1] alleging trademark counterfeiting and copyright infringement. (Dkt. 1.) MEC's five-count second amended complaint brings claims for (1) willful trademark infringement and counterfeiting in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) willful false designation of origin in violation of section 43 of the Lanham Act, 15 U.S.C. § 1125; (3) willful cybersquatting in violation of section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d); (4) willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510 *et seq.*; and (5) deliberate copying of MEC's copyrighted designs in violation of the Copyright Act, 17 U.S.C. § 501(a). (Dkt. 53 (Second Am. Compl.) ¶¶ 34–62.) On May 20, 2015, the court entered a temporary restraining order (TRO) freezing defendants' PayPal accounts. (Dkt. 22.) The court converted the TRO to a preliminary injunction on May 27, 2015. (Dkt. 33.) Two defendants, Wu Zou

---

[1] Defendants are operating the Online Marketplace Accounts and Defendant Domain Names listed in Amended Schedule A to the Second Amended Complaint. *See* dkt. 53. After MEC filed its most recent amended complaint, it voluntarily dismissed numerous defendants (*see* dkts. 62, 63, 64, 67, 71, 75, 81, 100) and the court ordered the dismissal of those defendants (*see* dkts. 66, 103).

d/b/a the Internet Store Legend Trading Co., Ltd. ("Legend Trading") and Zhang Yuan d/b/a Internet Store mqxxc, have moved to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and to release the frozen funds. (Dkts. 50, 57.) For the reasons stated below, defendants' motions are denied.[2]

## BACKGROUND[3]

In 2002, MEC launched its MONSTER ENERGY® brand of drinks bearing its now famous MONSTER ENERGY mark and design. (Second Am. Compl. ¶ 5.) MEC is the owner of numerous valid trademarks. (*Id.* at 14–15.) In addition to its MONSTER™ line of energy drinks, MEC uses its Claw Icon mark, MONSTER™ mark, MONSTER ENERGY® mark, and has copyrighted designs in connection with a large variety of products, including stickers, helmets, sports gear, clothing items, headgear, and sports bags (the Monster Energy Products). (*Id.* ¶ 8; *see also* dkt. 88 (Kingsland Dec.) ¶ 4.) Due to its substantial and continuous marketing and promotion, MEC's MONSTER™ family products have achieved substantial commercial success, with estimated retail sales exceeding $5 billion per year worldwide. (*See* Second Am. Compl. ¶ 13.) MEC has also sold millions of dollars' worth of MEC's MONSTER™ family of products to Illinois residents through brick and mortar accounts such as 7-Eleven, Walmart, Costco, Sam's Club, CVS, Target, and Circle K, to name a few. (Kingsland Dec. ¶ 7.) The success of the Monster Energy brand has resulted in its significant counterfeiting, giving rise to the present claims. (*See* Second Am. Compl. ¶ 25.)

---

[2] The court has jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). Venue is proper in this district under 28 U.S.C. § 1391(b).

[3] Unless otherwise noted, the following facts are taken from the second amended complaint "with every inference drawn in favor" of the plaintiff. *Cent. States, Se. & Sw. Areas Pension Fund* v. *Phencorp Reins. Co.*, 440 F.3d 870, 878 (7th Cir.2006) (quoting *Textor* v. *Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1393 (7th Cir.1993)).

Legend Trading and mqxxc created and operated commercial, fully interactive Internet stores on the global marketplace AliExpress.com (AliExpress). (*Id.* ¶ 23; *see also* dkts. 87 at 3, 89 ¶ 2, 92 at 3, 94 ¶ 2.) AliExpress is an English language global retail marketplace for Chinese sellers to target and sell to consumers worldwide. (Dkts. 87 at 3, 92 at 3; *see also* dkts. 89, 94 (collectively, Martin Decs.) ¶ 5.) Through AliExpress, Chinese sellers learn techniques for targeting United States buyers. (Dkt. 90, 95 (collectively, Fu Decs.) ¶¶ 21–22.)

Each defendant through its Internet store targets and offers to sell counterfeit Monster Energy Products to consumers within the United States, including Illinois. (Second Am. Compl. ¶ 23.) Defendants' offers to sell consist of displaying photographs of counterfeit Monster Energy Products and inviting potential buyers to buy products through their Internet stores. Then, defendants have the ordered items shipped to the United States. (*See id.* 35–36; *see also* Martin Decs. ¶ 6.) In creating their online stores, defendants affirmatively select a shipping template to ship their products, including counterfeit Monster Energy Products, to the United States and Illinois. (*See id.*; *see also* Martin Decs. ¶¶ 7–8; Fu Decs. ¶¶ 3–14.)

## ANALYSIS

I. **Personal Jurisdiction**

    A. **Legal Standard**

Rule 12(b)(2) permits dismissal of a claim based on lack of personal jurisdiction over the defendant. *See* Fed. R. Civ. P. 12(b)(2). The party asserting personal jurisdiction bears the burden of proof. *See Purdue Research Found.* v. *Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When the court rules on the motion without a hearing, the plaintiff need only establish a "*prima facie* case of personal jurisdiction." *Id.* (quoting *Hyatt Int'l Corp.* v. *Coco*, 302 F.3d 707, 713 (7th Cir. 2002)). The court will "read the complaint liberally, in its entirety,

and with every inference drawn in favor" of the plaintiff. *Cent. States*, 440 F.3d at 878 (quoting *Textor*, 711 F.2d at 1393). Jurisdictional allegations pled in the complaint are accepted as true unless proved otherwise by affidavits or exhibits. *See Purdue Research Found.*, 338 F.3d at 782. But "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783. If any conflicts arise between the plaintiff's complaint (or supporting materials) and the defendant's affidavits or evidence, the plaintiff is entitled to have those conflicts resolved in its favor. *Id.*

### B.  Court's Review of Personal Jurisdiction

Plaintiff asserts claims under the Lanham Act, Copyright Act, and Illinois statutory law. Because neither the Lanham Act nor the Copyright Act authorizes nationwide service of process, a court sitting in Illinois may exercise jurisdiction over defendants only if authorized both by the United States Constitution and Illinois law. *be2 LLC* v. *Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) (citing Fed. R. Civ. P 4(k)(1)(A) and stating that the Lanham Act does not authorize nationwide service); *Tamburo* v. *Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010) (same); *Janmark, Inc.* v. *Reidy*, 132 F.3d 1200, 1201 (7th Cir. 1997) (Copyright Act does not authorize nationwide service), *abrogated on other grounds by Advanced Tactical Ordinance, LLC* v. *Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014). The Illinois long-arm statute "permits its courts to exercise personal jurisdiction on any basis permitted by the constitutions of both Illinois and the United States." *Id.*; 735 Ill. Comp. Stat. 5/2-209(c). Accordingly, "the state statutory and federal constitutional inquiries merge." *Tamburo*, 601 F.3d at 700.

The key constitutional question is whether the defendants have sufficient "minimum contacts" with Illinois such that the suit "does not offend traditional notions of fair play and

substantial justice." *Int'l Shoe Co.* v. *Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (internal quotations marks omitted). That is to say, each defendant must have purposely established minimum contacts with the forum state such that he or she "should reasonably anticipate being haled into court" there. *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (quotation marks omitted). A defendant cannot avoid jurisdiction "merely because the defendant did not *physically* enter the forum State." *Id.* at 476. Indeed, as the Supreme Court has observed, "a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* Nevertheless, "[p]otential defendants should have some control over—and certainly should not be surprised by—the jurisdictional consequences of their actions." *RAR, Inc.* v. *Turner Diesel, Ltd.,* 107 F.3d 1272, 1278 (7th Cir.1997). The Due Process Clause "gives some minimum assurance as to where that conduct will and will not render them liable to suit." *World–Wide Volkswagen* v. *Woodson,* 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980).

Under the Illinois long-arm statute, personal jurisdiction may be general or specific. *uBid, Inc.* v. *GoDaddy Grp., Inc*., 623 F.3d 421, 425 (7th Cir. 2010). MEC does not argue that the court has general jurisdiction. Accordingly, the court turns to whether it has specific jurisdiction over defendants.

    **1.**    **Specific Jurisdiction**

Specific jurisdiction grows out of "the relationship among the defendant, the forum, and the litigation." *Walden* v. *Fiore*,—— U.S. ——, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014) (quoting *Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)). Specific jurisdiction requires that "(1) the defendant has purposefully directed his

activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *N. Grain Mktg., LLC* v. *Greving*, 743 F.3d 487, 492 (7th Cir. 2014) (quoting *Tamburo*, 601 F.3d at 701). "The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *Id.* (citing *Tamburo*, 601 F.3d at 702).

### a. Minimum Contacts – Whether Defendant's Activities Were Purposefully Directed At Illinois

Whether a defendant has purposefully directed activities at a forum "depends in large part on the type of claim at issue." *Felland* v. *Clifton*, 682 F.3d 665, 674 (7th Cir.2012). Where the plaintiff's claims are for intentional torts, as here,[4] the inquiry "focuses on whether the conduct underlying the claims was purposely directed at the forum state." *Id.* at 674 (quoting *Tamburo*, 601 F.3d at 702). In this context, courts apply the "express aiming test" and look to whether the defendant engaged in "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo*, 601 F.3d at 703 (citing *Calder* v. *Jones*, 465 U.S. 783, 789–90, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)).[5] "The defendant's conduct and connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there." *N. Grain*

---

[4] "Infringement of a trademark is a tort." *Dakota Indus., Inc.* v. *Dakota Sportswear, Inc.*, 946 F.2d 1384, 1388 (8th Cir.1991); *see also Louis Vuitton Malletier, S.A.* v. *Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013); *Chloé* v. *Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir.2010) ("Trademark infringement is ... a tort."); *Polar Bear Prods., Inc.* v. *Timex Corp.*, 384 F.3d 700, 720 (9th Cir.2004) ("[T]rademark infringement generally sounds in tort.").

[5] Courts have applied the *Calder* "express aiming test" in cases involving intentional torts, including trademark infringement. *See, e.g., Medline Indus., Inc.* v. *Strategic Commercial Sols., Inc.*, 553 F. Supp. 2d 979 (N.D. Ill. 2008); *Euromarket Design, Inc.* v. *Crate & Barrel Ltd.*, 96 F. Supp. 2d 824 (N.D. Ill. 2000); *see also Virgin Enter. Ltd.* v. *Jai Mundi, Inc.*, No.13 C 8339, 2014 WL 3605541, at *5 (N.D. Ill. July 18, 2014) (explaining that it was unnecessary to apply *Calder*'s express aiming test in this trademark infringement case because defendant's "actual (as opposed to imputed) contacts with Illinois were sufficient to support the exercise of specific personal jurisdiction").

*Mktg.*, 743 F.3d at 492. In other words, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden*, 134 S. Ct. at 1122 (citations omitted).

### i. Intentional and Tortious Conduct

Section 32 of the Lanham Act creates a civil right of action for trademark infringement and counterfeiting. Under the plain language of 15 U.S.C. § 1114, an offer to sell an infringing or counterfeit item, even without any other activity, establishes liability for trademark infringement and counterfeiting. *Levi Strauss* v. *Shilon*, 121 F.3d 1309, 1312 (9th Cir. 1997); *Chloe SAS* v. *Sawabeh Information Servs. Co.*, No. cv 11-04147, 2014 WL 4402218, at *6 (C.D. Cal. Sept. 5, 2014). Displaying photos of an item for sale and inviting potential purchasers to place an order and buy the product through an Internet store is an offer for sale. *See Milo & Gabby, LLC* v. *Amazon.com*, No. C13-1932, 2015 WL 4394673, at *14 (W.D. Wash. July 16, 2015); *cf. MEMC Elec. Materials Inc.* v. *Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (concluding that letters that conveyed "a description of the allegedly infringing merchandise and the price at which it can be purchased" could be regarded as an "offer to sell" under 35 U.S.C. § 271(a)).

Here, one of MEC's numerous exhibits filed with the court illustrate that Legend Trading made an offer to sell when it displayed photos of biker gloves with Monster Energy's trademark for sale at $8.99 with 8991 pieces and three colors available on its Internet store. (*See* dkt. 27-7.; *see also* Martin Decs. ¶ 10.) Similarly, another one of MEC's exhibits illustrates that mqxxc made an offer to sell when it displayed photos of Monster Energy graphic sticker decals for sale at $39.99 with 999 pieces available on its Internet store. (*See* dkt. 27-8; *see also* Martin Decs.

7

¶ 10.) Defendants invite potential purchasers to place orders and buy products through their Internet stores, and MEC's exhibits show that at least two individuals, Lisa Cho and Gigi Ah, with Illinois shipping addresses attempted to purchase counterfeit Monster Energy biker gloves from Legend Trading, and at least one individual, Tyronn Chen, with an Illinois shipping address attempted to purchase counterfeit Monster Energy sticker decals from mqxxc. (*See* dkts. 27-7, 27-8; *see also* Martin Decs. ¶¶ 7, 10, 11.) MEC's Exhibit 2-17 also includes an email conversation between Ah and Zou in which Zou provides Ah with Legend Trading's PayPal account and indicates that she can pay for her order via PayPal. (*See* dkts. 27-7; *see also* Martin Decs. ¶ 11.) Similarly, MEC's Exhibit 2-18 includes a conversation between Chen and Yuan in which Yuan provides Chen with mqxxc's PayPal account number and indicates that Chencan pay for the Monster decal stickers via a specific PayPal account. (*See* dkts. 27-8; *see also* Martin Decs. ¶ 11.) As such, defendants' offers to sell counterfeit Monster Energy Products on their Internet stores constitute tortious activity committed in Illinois sufficient to establish personal jurisdiction over both defendants in this court. *See Dental Arts Lab., Inc.* v. *Studio 360 The Dental Lab, LLC*, No. 10 C 4535, 2010 WL 4877708, at *7 (N.D. Ill. Nov. 23, 2010) ("As long as one tortious act is committed in Illinois, the courts of the state, and thus this Court, may exercise personal jurisdiction over Defendant."); *see also Steuben Foods, Inc.* v. *Oystar USA*, 2012 WL 1854642, at *2 (W.D.N.Y. May 21, 2012) (citing to *Houbigant, Inc.* v. *ACB Mercantile, Inc.*, 914 F. Supp. 964, 979–80 (S.D.N.Y 1995) ("Offering one copy of an infringing work for sale in New York, even if there is no actual sale, constitutes commission of a tortious act within the state sufficient to imbue this Court with personal jurisdiction.").

### ii.     Express Aiming at the Forum State

"[A] defendant's intentional tort creates the requisite *minimum contacts* with a state only when the defendant *expressly aims* its actions at the state with the knowledge that they would cause harm to the plaintiff there." *Mobile Anesthesiologists Chicago, LLC* v. *Anesthesia Associates of Houston Metroplex, P.A.*, 623 F.3d 440, 445 (7th Cir. 2010) (emphasis added). This court has characterized the express aiming test to require a showing of "injury plus." *Telemedicine Solutions LLC* v. *WoundRight Techs., LLC*, 27 F. Supp. 3d 883, 895 (N.D. Ill. Mar. 14, 2014). That is, the plaintiff must demonstrate not only that the defendant's tortious act injured him in the forum state, but that the defendant acted specifically to harm the plaintiff in the forum state. *See id.*

Citing *Alcar Group, Inc.* v. *Corporate Performance Sys.*, 109 F. Supp. 2d 948, 949 (N.D. Ill. 2000), defendants argue that infringing sales abroad via their websites do not create the necessary minimum contacts since the Lanham Act has no extraterritorial reach.   Defendants' contentions wholly disregard MEC's claim that defendants offered to sell counterfeit Monster Energy Products to individuals with Illinois shipping addresses, rather than alleging sales by defendants abroad. In *Alcar Group*, the issue was whether the court had jurisdiction over a foreign citizen's *activity in a foreign country*. *Alcar Group*, 109 F. Supp. 2d at 951. Here, the issue is whether the court has personal jurisdiction over a foreign citizen's *activity in the United States*. As such, *Alcar Group* is inapposite.

Defendants also argue that their interactive websites alone are not sufficient to establish minimum contacts. (Dkt. 51 at 3 (quoting *Advanced Tactical*, 751 F.3d at 803 ("The operation of an interactive website does not show that the defendant has formed a contact with the forum state.")).) MEC does not dispute that an interactive website alone would be insufficient but

argues that defendants created and operated interactive Internet stores and affirmatively selected a shipping option to ship counterfeit Monster Energy Products to the United States, including to Illinois residents. (Martin Decs. ¶¶ 7–8.) As such, MEC argues that the facts here are directly analogous to *Illinois* v. *Hemi Group, LLC*, 622 F.3d 754 (7th Cir. 2010). (Dkt. 87 at 10.) The court agrees.

In *Hemi Group*, the defendant was sued by the State of Illinois for selling cigarettes to Illinois residents in violation of federal and state law. *Hemi Grp. LLC*, 622 F.3d at 755. The court in *Hemi Group* found that it had personal jurisdiction over defendants because they operated a nationwide business model where they intentionally created and operated several commercial, interactive websites to offer products for sale and allow online orders from Illinois residents. *Hemi Grp. LLC*, 622 F.3d at 757–58. The Seventh Circuit explained that, "[a]lthough listing all forty-nine states by name would have made a stronger case for jurisdiction in this case, . . . the net result is the same—Hemi stood ready and willing to do business with Illinois residents." *Id.* at 758. As such, the court held that specific jurisdiction is proper where a company "h[olds] itself out as open to do business with every state" and is "ready and willing to do business with [that state's] residents."

Similarly, in this case, defendants intentionally created and operated commercial, fully interactive AliExpress Internet stores through which consumers can purchase counterfeit Monster Energy Products. In creating their online stores, defendants affirmatively selected a shipping template to ship counterfeit Monster Energy Products to United States and Illinois residents. (Martin Decs. ¶¶ 7–8; *see also* Fu Decs. ¶¶ 3–14.) As a result, defendants expressly elected to do business with the residents of all fifty states, including Illinois. *See Hemi Grp. LLC*, 622 F.3d at 758; *see also uBid*, 623 F.3d at 428 ("[I]t is easy to infer that GoDaddy's

national marketing campaign is intended to reach as large an audience as possible, including the 13 million potential customers in the nation's fifth most populous state [(Illinois).]")

Defendants also argue that the court lacks personal jurisdiction because no sale was made to an Illinois resident (Dkt. 52 ¶ 7; Dkt. 59 ¶ 5), and MEC has presented no evidence that either Cho or Chen is even located in Illinois. (Dkt. 51 at 4.) First, as indicated above, an offer to sell infringing or counterfeit items establishes liability for trademark infringement, a tortious act, and "[a]s long as one tortious act is committed in Illinois the courts of the state, and thus this Court, may exercise personal jurisdiction over Defendant," *Dental Arts Lab.*, 2010 WL 4877708, at *7. As such, defendants did not need to complete a sale to imbue Illinois courts with personal jurisdiction. Second, there is no requirement that MEC or the person placing the order reside in Illinois in order for this court to have jurisdiction over defendants. *Walden*, 134 S. Ct. at 1121–22 ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on 'the relationship among the defendant, the forum, and the litigation.' . . . [O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.") MEC's claims against defendants are based on defendants' offers to sell counterfeit Monster Energy products through their interactive Internet store, which allows online orders to be placed and shipped to Illinois addresses. MEC, through its exhibits and affidavits, has alleged that at least on one occasion Zou (on behalf of Legend Trading) communicated with a buyer who had placed an order to purchase counterfeit Monster Energy Products, asked the buyer for the order number which clearly reflected an Illinois shipping address, and provided his PayPal account number for the buyer to make the payment for the item. (*See* Dkt. 27-7; *see also* Martin Decs. ¶ 11.) Similarly, MEC's exhibits and affidavits allege that at least on one occasion Yuan (on behalf of

mqxxc) communicated with a buyer who wished to place an order on counterfeit Monster sticker decals and provided his PayPal account number for the buyer to purchase the item. (*See* dkt. 27-8; *see also* Martin Decs. ¶ 11.) It is these tortious acts on which MEC basis its argument that Illinois has specific jurisdiction. *See Dental Arts Lab.,* 2010 WL 4877708, at *7 ("As long as one tortious act is committed in Illinois, the courts of the state, and thus this Court, may exercise personal jurisdiction over Defendant.")

Defendants also claim that it is insufficient to rely on defendants' "random, fortuitous, or attenuated contacts" or on the "unilateral activity" of MEC. (Dkt. 51 at 5.) First, Legend Trading's actions are not "random, fortuitous, or attenuated contacts." It is true that in the Internet context, there is no specific jurisdiction where the defendant's contacts with the forum state are "entirely fortuitous." *Advanced Tactical*, 751 F.3d at 803 (no specific personal jurisdiction over defendant that maintained email list allowing it to send email to past customers, even though some happened to be in forum state). But where a company "h[olds] itself out as open to do business with every state" and is "ready and willing to do business with [that state's] residents," specific jurisdiction over it is proper. *Hemi Grp. LLC*, 622 F.3d at 758 (internet seller of cigarettes subject to specific personal jurisdiction in Illinois where Illinois residents purchase cigarettes online and seller then shipped cigarettes to Illinois); *see also Valtech, LLC* v. *18th Ave. Toys Ltd.*, No. 14 C 134, 2015 WL 603854, at *4 (N.D. Ill. Feb. 12, 2015); *Payton* v. *Kale Realty*, No. 13 C 8002, 2014 WL 4214917, at *4 (N.D. Ill. Aug. 26, 2014). Moreover, in 2011 the court in *Deckers Corp.* v. *Does 1-500* found that personal jurisdiction existed over China-based defendants operating commercial, interactive Internet stores to offer to sell and to sell counterfeit products to the United States, including Illinois. *Deckers Corp.* v. *Does 1-500*, No. 1:11 CV 00010, 2011 WL 4929036, at *3 (N.D. Ill. Oct. 14, 2011). Since *Deckers Corp.*,

numerous cases, within this district alone, have exercised jurisdiction over defendants operating commercial, interactive Internet stores offering to sell counterfeit products to the United States, including Illinois. (*See* dkt. 87 at 8; Martin Decs. ¶ 14.)

Second, it is misleading to classify the offer to sell as a "unilateral activity" by the plaintiff. *See Hemi Grp. LLC*, 622 F.3d at 758. In *Hemi Group*, the court explained that

> [c]haracterizing the sales as unilateral is misleading, . . . because it ignores several of Hemi's own actions that led up to and followed the sales. . . . It is Hemi reaching out to residents of Illinois, and not the residents reaching back, that created the sufficient minimum contacts with Illinois that justify exercising personal jurisdiction over Hemi in Illinois.

*Id.* Here, defendants intentionally created and operated commercial, fully interactive Internet stores and affirmatively selected a shipping template to ship counterfeit Monster Energy Products to United States and Illinois residents. (Martin Decs. ¶¶ 7–8.) Further, MEC provides exhibits that include conversations in which defendants provide Illinois buyers with their PayPal account information in order to complete their purchase. (Dkts. 27-7, 27-8.) Thus, it was defendants' reaching out to Illinois residents that created the sufficient minimum contacts with Illinois.

Defendants further argue that "the alleged offer is invalid since it was induced by fraud" and that the MEC "cannot point to a single valid offer to sell an infringing product into Illinois." (Dkt. 51 at 5.) Defendants' argument completely misses the mark. Here, MEC claims that defendants committed tortious acts by offering to sell counterfeit Monster Energy Products and that such offers to sell took place the moment defendants displayed photographs of counterfeit Monster Energy Products for sale and invited potential buyers, including Illinois buyers, to place orders and buy products through their Internet stores. *See Milo & Gabby,* 2015 WL 4394673, at *14. Defendants do not provide any evidence to suggest that they were induced by fraud to post

13

images of counterfeit Monster Energy Products and invite potential Illinois buyers to place orders and buy counterfeit products.

Lastly, defendants attempt to analogize this case to *Advanced Tactical*. There, the Seventh Circuit found that "it [was] unlikely that those few sales alone, without some evidence *linking* them to the allegedly tortious activity, would make jurisdiction proper." *Advance Tactical*, 751 F.3d at 801. In other words, plaintiff provided "no evidence that those sales had any connection with this litigation." *Id.* By contrast, here, MEC provides evidence that defendants offered to sell counterfeit Monster Energy Products, *see* dkts. 27-7, 27-8, and MEC bases its claims on that specific tortious conduct of "offering to sell" counterfeit product in violation of the Lanham Act. Based on MEC's affidavits and supporting materials, the court finds Legend Trading expressly aimed its action at Illinois.

### iii. Defendant's Knowledge That the Effects Would be Felt in the Forum State

To establish minimum contacts a defendant must not only "expressly aim" its actions at the state but must do so "with the knowledge that [it] would cause harm to the plaintiff there." *Mobile Anesthesiologists Chicago*, 623 F.3d at 445. Here, the Director of Global Brand Protection & Corporate Investigations of Monster Energy Company, Bruce Kingsland, proffers that MEC uses its registered trademarks and copyrights on and in connection with the creation and distribution of a large variety of products, including but not limited to, energy drinks, stickers, clothing items, helmets, headgear, sports gear, and sports bags. (Kingsland Dec. ¶ 4.) Kingsland also states that "millions of dollars' worth of MEC's MONSTER$^{TM}$ family of products have been sold to Illinois residents through brick and mortar accounts such as 7-Eleven, Walmart, Costco, Sam's Club, CVS, Target, and Circle K, to name a few." (*Id.* ¶ 7.) Based on MEC's considerably large sales in Illinois, the fact that Illinois is the fifth most populous state,

14

and the fact that counterfeit sales lower the market share of the rights holder, MEC has established by a preponderance of the evidence that defendants knew that in targeting consumers in the United States the effects of its tortious acts would likely be felt in Illinois.

      **b.**      **Relatedness – Whether MEC's Claim Arose Out Of Such Activities**

The court's conclusion that defendants' conduct was "purposely directed" at Illinois does not end the jurisdictional inquiry. For the court to exercise specific jurisdiction over defendants, MEC's claims must "arise out of" or "relate to" defendants' contacts with Illinois. *RAR, Inc.*, 107 F.3d at 1277–78. This requirement is satisfied here. As in *Hemi Group*, MEC's claims arise out of defendants' forum-related activities and contacts with Illinois residents. Defendants offered to sell counterfeit Monster Energy Products on its AliExpress Internet store to individuals with Illinois addresses. Such actions constitute tortious activity committed in Illinois, and defendants' actions surrounding those offers triggered MEC's claims against it. Accordingly, MEC's claims arise directly out of the defendants' contacts with Illinois.

      **c.**      **Fairness – Whether Specific Jurisdiction is Consistent with Traditional Notions of Fair Play and Substantial Justice**

Finally, the court must consider whether the exercise of personal jurisdiction over defendants would offend traditional notions of fair play and substantial justice. *See N. Grain Mktg.*, 743 F.3d at 492 (quoting *Int'l Shoe*, 326 U.S. at 316). The factors considered are "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Felland*, 682 F.3d at 677 (quoting *Burger King*, 471 U.S. at 477). "These factors rarely will justify a determination against personal jurisdiction." *Purdue Research Found.*, 338 F.3d at 781 n.10.

While defendants may be burdened by having to defend an action in this state, "out-of-state defendants *always* face such a burden." *Felland*, 682 F.3d at 677 (emphasis in original). Notably, despite any potential claims of hardship, defendants have already retained local counsel and engaged in motion practice in this court. *See Jackson* v. *N'Genuity Enterprises, Co.*, 2014 WL 4269448 (2014) (finding, in part, that exercising personal jurisdiction over the defendant did not run afoul of traditional notions of fair play and substantial justice where the defendant had been litigating the related 2009 suit in this forum and had retained attorneys in the forum). Moreover, modern transportation and communications have made it much less burdensome for a party to defend itself in a state where he derives economic benefits, and it usually will not be unfair to subject him to the burdens of litigating in another forum. *Burger King*, 471 U.S. at 474. Furthermore, Illinois has an interest in protecting Illinois consumers from being deceived into purchasing counterfeit Monster Energy Products. Thus, exercising personal jurisdiction over defendants does not run afoul of traditional notions of fair play and substantial justice.

## II.     Freezing of Property under Party's Control

"Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under its control, whether the property be within or without the United States." *United States* v. *First Nat. City Bank*, 379 U.S. 378, 384, 85 S. Ct. 528, 13 L. Ed. 2d 365 (1965); *see also Gucci Am., Inc.* v. *Weixing Li*, 768 F.3d 122, 129 (2d Cir. 2014); *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.* v. *Kovalic*, No. 94-2545, 1995 WL 375869, at *2 (7th Cir. 1995); *Fed. Trade Comm'n* v. *Windermere Big Win Int'l, Inc.*, No. 98 C 8066, 1999 WL 608715, at *4 (N.D. Ill. Aug. 5, 1999). On issuing the TRO and preliminary injunction in this case, the court found that it had personal jurisdiction over defendants "since the defendants directly target their business activities towards consumers in the

United States, including Illinois." (*See* dkts. 22, 33.) On reviewing defendants' motion to dismiss for lack of personal jurisdiction, this court once again has concluded that it has personal jurisdiction over defendants. As such, the funds contained in defendants' PayPal accounts will remain frozen. *See Lorillard Tobacco Co.* v. *Montrose Wholesale Candies*, 2005 WL 3115892, at *13 (N.D. Ill. Nov. 8, 2005) (citing *Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 325 (1999)).

### A. Dissolving the Injunction and Funds Unrelated to Infringement

Defendants argue that even if this court has personal jurisdiction to freeze its assets, the court should dissolve the injunction because MEC cannot show likelihood of success on the merits or irreparable harm. (Dkts. 51 at 7, 58 at 6–7.) This court, however, already found that MEC showed a likelihood of success on the merits and irreparable harm. (Dkt. 33 at 5.) Defendants have not provided evidence to counter such a finding, and thus, this court will not dissolve the injunction.

Defendants also argue that the court should modify the injunction to limit the seizure to an amount corresponding to the products alleged to have been offered for sale, rather than the seizure of their entire PayPal account. (Dkts. 51 at 10, 58 at 9–10.) The court declines to modify the injunction at this time. To exempt assets from an asset freeze, "[t]he burden is on the party seeking relief to present documentary proof that particular assets [are] not the proceeds of counterfeiting activities." *Luxottica USA LLC* v. *The Partnership, et al.*, No. 1:14-cv-09061, 2015 WL 3818622 (N.D. Ill. June 18, 2015) (citing *N. Face Apparel Corp.* v. *TC Fashions, Inc.*, No. 05 CIV. 9083(RMB), 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006)). Defendants have not submitted any evidence regarding their PayPal account transactions to show that these funds are not the proceeds of counterfeiting activities.

**B.      Increasing Bond Amount**

Defendants also argue that even if the court does not dissolve the injunction, it should require MEC to post a larger bond in the amount of at least $5,000 per defendant. Defendants argue that the court should increase the bond because they are one of hundreds of defendants whose businesses grounded to a halt the moment their PayPal accounts were frozen, and thus, the $10,000 bond the court previously ordered MEC to pay is insufficient. MEC responds that the court properly required MEC to post a bond of $10,000 because of the strong and unequivocal nature of MEC's evidence.

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him. *Ty, Inc.* v. *Publications Intern. Ltd.,* 292 F.3d 512, 516 (7th Cir. 2002). The appropriate amount of the bond is subject to the court's discretion. Fed. R. Civ. P. 65(c); *Gateway E. Ry. Co.* v. *Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1141 (7th Cir.1994). But, because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, the court of appeals has stated that district courts should err on the high side when setting a bond. *See Habitat Educ. Center* v. *U.S. Forest Serv.,* 607 F.3d 453, 456 (7th Cir.2010). On granting the TRO and preliminary injunction, the court ordered MEC to deposit $10,000 as security, an amount consistent with bonds required in similar cases. *See, e.g.*, *Burberry Limited, et al.* v. *Su Sheng, et al.*, No. 1:15-cv-02851 (N.D. Ill. May 27, 2015) ($10,000 bond); *Beats Electronics,*

18

*LLC* v. *The Partnerships, et al.*, No. 1:14-cv-05209 (N.D. Ill. Oct. 7, 2014) ($10,000 bond); *Calvin Klein Trademark Trust, et al.* v. *The Partnerships, et al.*, No. 1:13-cv-08186 (N.D. Ill. Jan. 14, 2014) ($10,000 bond); *True Religion Apparel, Inc.* v. *Does 1-100*, No. 12-cv-9894 (N.D. Ill. Dec. 20, 2012) ($10,000 bond); *Tory Burch LLC* v. *Zhong Feng, et al.*, No. 1:12-cv-09066 (N.D. Ill. Nov. 15, 2012) ($10,000 bond); *Deckers Outdoor Corp.* v. *Does 1-1,281*, No. 1:12-cv-01973 (N.D. Ill. Apr. 4, 2012) ($10,000 bond). Now, Legend Trading seeks to persuade the court that the bond amount should be increased.

"A party may move the court to increase or decrease the amount of security so long as the restraint or injunction is in effect." 13 Moore's Federal Practice—Civil § 65.50; *see also Gateway*, 35 F.3d at 1142 (noting "that it is within the district court's discretion to increase or decrease the amount as necessary to comport with its findings, or to account for changed circumstances"); *Laboratory Corp. of America Holdings* v. *Kearns*, No. 1:14 CV 1029, 2015 WL 413788, at *16 (M.D.N.C. Jan. 30, 2015) (explaining that "should either party conclude that a different figure would be proper, it may move for adjustment of the bond amount while the preliminary injunction is still in effect"). The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint. *In re President Casinos, Inc.*, 360 B.R. 262, 266 (B.A.P. 8th Cir. 2007); *APR Energy, LLC* v. *First Inv. Grp. Corp.*, No. 3:14-CV-575-J-34JBT, 2015 WL 736275, at *17 (M.D. Fla. Feb. 20, 2015); *Philips Electronics N. Am. Corp.* v. *Hope,* 631 F.Supp.2d 705, 724 n. 14 (M.D.N.C.2009); *Int'l Equity Investments, Inc.* v. *Opportunity Equity Partners Ltd.,* 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006), *aff'd,* 246 Fed. App'x 73 (2d Cir. 2007). Here, defendants allege that the injunction seized its PayPal funds in the amount of $14,278 (Legend Trading) and $11,744.89 (mqxxc), and that the ten-thousand dollar $10,000 bond is insufficient

to compensate all defendants where possibly millions of dollars have been frozen. But, in their request to increase the bond, defendants present nothing more than self-serving affidavits with no supporting evidence to justify such an increase. Given their better position to assess the damage that might result from having their PayPal accounts frozen, defendants should have provided affidavits or other evidence to establish the financial damage it would suffer from the injunction during the pendency of the case. *See Manpower Inc.* v. *Mason*, 377 F. Supp. 2d 672, 681 (E.D. Wis. 2005) (declining to require a $20 million bond where the restrained party provided no evidence to support that this amount was a reasonable expectation of the pecuniary harm it would suffer due to the injunction). It has not done so. As such, the court will not increase the bond amount. Defendants, however, may apply for a bond increase in the future if they can produce competent evidence of the pecuniary harm they may reasonably expect to suffer on account of this injunction.

## CONCLUSION AND ORDER

For these reasons, defendants' motions to dismiss and to release frozen funds (dkts. 50, 57) are denied.

Date: September 29, 2015 _____

U.S. District Judge